# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                No. 12-CR-3187 RB

JESSE ALONZO ARJON,

      Defendant.

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

**THIS MATTER** is before the Court on Defendant Jesse Alonzo Arjon's Motion to Suppress, filed January 10, 2013. (Doc. 28). Having carefully considered the submissions of counsel, relevant caselaw, and evidence adduced at the February 15, 2013 hearing, the Court **DENIES** Defendant's motion.

### FINDINGS OF FACT

Federal Rule of Criminal Procedure 12(d) provides that when factual issues are involved in deciding a motion, the Court must state its essential findings on the record. The Court makes the following factual findings based on the evidence adduced at the evidentiary hearing, including the testimony from United States Border Patrol Agents Francisco Hernandez, Humberto Flores, Eduardo Silva, and Eduardo Solis, Jr.

The Court found that each of the agents testified credibly. Each agent has years of experience with the Border Patrol and extensive experience in drug interdiction along the United States-Mexico border. All responded fully to the questions asked during the hearing, maintained good eye contact, had a strong recollection of the events at issue, and testified without notes. In

addition, Agents Hernandez, Flores, and Solis freely admitted when they did not recall the answer to a question posed. For the most part, the testimony provided by the agents was consistent. However, there were some areas in which the testimony conflicted. The Court will address those areas below and weigh the credibility of the witnesses as to each specific conflict.

The Border Patrol's interest in a 1995 gold Toyota Camry in the Santa Theresa, New Mexico area arose in the days prior to November 14, 2012, the date at issue in the instant motion. Agent Hernandez was aware that the gold Camry had been linked to an alleged load of narcotics that eluded the Border Patrol on November 5, 2012 at the Stanco Metal Products warehouse in Santa Theresa. On November 12, 2012, a Border Patrol supervisor stopped a 1995 gold Camry within a few miles of the Stanco warehouse to conduct a welfare check. Finding no reasonable suspicion to detain the driver, the agent allowed the vehicle to continue on its way. On November 14, 2012 at 4:00 p.m., the Border Patrol agents covering the Santa Theresa zone were briefed by intelligence agents to keep an eye out for the 1995 gold Camry. Later that evening, around 8:30 p.m., the Santa Theresa Port of Entry advised that a 1995 gold Camry had crossed into the United States from Mexico. Thus, there was an alert to be on the lookout (called a "BOLO") for this 1995 gold Camry during the evening shift for the Santa Theresa Border Patrol zone.

After receiving the information from the Port of Entry, Agent Hernandez proceeded to the Stanco warehouse and found the 1995 gold Camry parked outside. The warehouse is located just 350 yards from the United States-Mexico border, with the border fence easily visible from the side of the warehouse, and it is known to Border Patrol agents as a common loading zone for narcotics. Ultimately, agents stopped the gold Camry on Pete V. Domenici Memorial Highway ("Domenici Highway") at approximately mile marker three, close to the intersection between

Domenici Highway and State Highway 9 ("Highway 9"). The agents requested and received consent to search the Camry and found three duffel bags filled with approximately 100 bundles of what was later determined to be marijuana. When the marijuana was discovered, Agent Hernandez notified dispatch and all other agents on duty via his radio that marijuana had been discovered in the Camry.

While the surveillance, stop and search of the Camry were ongoing, other agents on patrol observed a black Chevrolet Silverado driving on Domenici Highway at a slow rate of speed. Agent Umberto Flores and his partner, Jesus Vasquez, were among those who observed the Silverado. They were detailed as field intelligence agents, so they were in plain clothes and an unmarked car on November 14, 2012. Agent Flores was aware of the BOLO alert for the gold Camry as he was patrolling Domenici Highway. As he drove northbound on Domenici Highway, he approached the black Silverado from behind, just south of the intersection of Domenici Highway and Highway 9. Agent Flores estimated that the Silverado was driving twenty to twenty-five miles per hour in a fifty-five mile per hour zone. Agent Eduardo Solis, Jr., who was also on patrol on Domenici Highway in a separate unmarked vehicle, confirmed that the Silverado was going twenty to twenty-five miles per hour when he encountered it. Because of the Silverado's slow speed, Agents Flores and Vasquez began mobile surveillance.

As Agent Flores approached the Silverado, he slowed his unmarked vehicle to approximately thirty-five miles an hour; nevertheless, he passed the Silverado. Observing the Silverado from his rearview mirror, Agent Flores witnessed it make a U-turn at approximately mile marker four and head south on Domenici Highway. Agent Flores continued to drive north and, once concealed by an overpass, executed a U-turn to continue mobile surveillance of the Silverado. Agent Flores again caught up to the Silverado and passed it. After passing the

intersection with Highway 9, the Silverado performed another U-turn and pulled to the side of the road just south of Highway 9. When the Silverado pulled off the road, it turned off its lights or, in Agent Flores' words, "blacked out." The vehicle remained on the side of the road with the lights off for two to three minutes, then the vehicle turned the lights back on and continued to drive north on Domenici Highway.

Agent Flores continued mobile surveillance of the Silverado as it drove north on Domenici Highway. Again, just before the vehicle reached the intersection of Domenici Highway and McNutt Road ("McNutt"), it pulled to the side of the road and "blacked out." The vehicle then turned its lights back on, began driving, and performed another U-turn (its third) to head south on Domenici Highway. After a few minutes of driving south, Agent Flores observed the Silverado execute a final U-turn (its fourth) north of the intersection with Highway 9.

All of this occurred in the desert area just outside of Santa Theresa, a suburb of El Paso, Texas. Specifically, the Silverado was driving up and down Domenici Highway between the intersections with Highway 9 and McNutt. Agent Flores described the area surrounding Domenici Highway before it reaches McNutt as almost entirely desert. However, there is a county airport and an industrial district just off of Airport Road to the west, which includes six to eight warehouses and generates some tractor-trailer traffic on Domenici Highway; a residential area, including Santa Theresa High School, a mile or two east on Airport Road; residential developments just to the south as Domenici Highway approaches McNutt; and a developed suburb after Domenici Highway intersects with McNutt and changes name to Artcraft Road. Indeed, Domenici Highway leads to two major intersections, and, after it becomes Artcraft, to Interstate 10.

Agent Flores stopped the Silverado approximately five minutes after receiving word that drugs had been found in the Camry. Ultimately, Agent Flores witnessed the Silverado perform four U-turns and pull off the road twice, "blacking out" both times. Based on Agent Flores' training and experience, he perceived the Silverado's driving pattern as uncommon on Domenici Highway and consistent with an effort to evade surveillance. All of these events occurred within a few miles of the United States-Mexico border in a desert area with light industrial use. The stop took place around 9:30 p.m., long after the sun had set. Agent Flores further considered the fact that drugs had been found in the Camry and, in his training and experience, he knew that it was common practice for drug couriers to use scout or lead vehicles to guide the vehicle carrying the drugs (the "load vehicle") to its destination, to distract law enforcement from the load vehicle, and to scout for law enforcement along the route. However, aside from being advised of the fact that drugs were found in the Camry, Agent Flores was not in contact with the agents on the scene with the Camry and did not know where the Camry had been stopped. On cross-examination, Agent Flores testified that he had a "hunch" that the Silverado was associated with the Camry.

When Agent Flores stopped the Silverado, his partner, Agent Vasquez, was also present at the scene. Shortly after stopping the Silverado, Agent Solis came to the scene. Because neither Agent Flores nor Agent Solis had a marked car, Agent Flores requested that a marked unit come to the scene.

Agent Flores approached the driver's side window of the Silverado. He identified himself as a Border Patrol agent in Spanish and inquired about the driver's identity and immigration status. The driver provided a driver's license, which identified him as Jesse Alonzo Arjon. Agent Flores testified that any question in his mind about Mr. Arjon's citizenship was satisfied at that point. Agent Flores asked Mr. Arjon what he was doing, to which Mr. Arjon replied that he had

just entered the United States and was arguing with his girlfriend. At that point, Agent Flores asked Mr. Arjon to step out of the vehicle and stand behind it for purposes of officer safety. Mr. Arjon complied. Because Mr. Arjon was alone in the car, Agent Flores surmised that he would have been arguing with his girlfriend over the telephone. Agent Flores requested and received permission to search Mr. Arjon's cellular telephone. Agent Flores looked through the phone and found neither text messages nor calls from or to a girlfriend. He did, however, find that the phone had made several other calls. He testified that his suspicions were further aroused because he could not determine the veracity of Mr. Arjon's story.

At some point during this interaction, Border Patrol Agent Eduardo Silva arrived on the scene in a marked vehicle. He spoke with Agent Flores and learned that Agent Flores believed that there was a link between Mr. Arjon and the Camry and, specifically, that Mr. Arjon may have been driving the lead vehicle. From Agent Silva's training and experience, he knows that drug traffickers are normally armed and that it is the lead vehicle's job to protect the load vehicle. Agents Silva and Flores described Mr. Arjon as fidgety, moving in place, unable to stand still, and failing to obey commands. The specific behavior that the agents described was that Mr. Arjon repeatedly turned to look at the agents after being directed several times to stand facing the back of the Silverado with his hands on the tailgate. Agent Solis described Mr. Arjon's behavior throughout the stop as calm. The Court does not find that inconsistent with the testimony of Agents Silva and Flores. The Court finds that though Mr. Arjon was calm, he was also fidgeting and turning to look at the agents. Agent Silva perceived Mr. Arjon's behavior as an effort to locate an escape route or to find a way to harm the agents. Accordingly, given his training and experience, Agent Silva was concerned about officer safety and decided to conduct a pat-down search.

While Agent Silva's officer safety concern was developing, Agent Flores requested and received permission to search Mr. Arjon's vehicle. Agent Flores did not find anything suspicious in the vehicle. There was some factual dispute as to whether the vehicle search preceded or coincided with the pat-down of Mr. Arjon's person. Agent Flores stated that the two occurred simultaneously, whereas Agent Silva testified that the vehicle search preceded the pat-down. However, the testimony was undisputed that Agent Flores was standing next to Agent Silva at some point while the pat-down was ongoing, because Agent Silva handed Agent Flores a second cellular telephone that he found in Mr. Arjon's pocket. Accordingly, the Court finds that the vehicle search concluded just after the pat-down search began.

Before Agent Silva conducted the pat-down, he told Mr. Arjon that he was going to pat him down and handcuff him for the safety of all parties. He told Mr. Arjon that he was not under arrest. Agent Silva did not ask permission to conduct the pat-down, but he did make those statements, to which Mr. Arjon replied, "That's fine." In patting down Mr. Arjon, Agent Silva felt a hard object over Mr. Arjon's left chest. Because Mr. Arjon was wearing a thick jacket, Agent Silva was unsure of the nature of the object. To ensure that it was not a weapon, he removed the object and found that it was the second cellular telephone. Agent Silva handed the recovered telephone to Agent Flores.

Agent Silva testified that he placed Mr. Arjon in handcuffs behind his back just before or after the pat-down search. He testified that he used handcuffs for officer safety while the investigation continued and that he advised Mr. Arjon that he was not under arrest. Agent Flores testified that Mr. Arjon was placed in handcuffs only after incriminating text messages were discovered and inculpatory statements were made. At the hearing, it was clear that Agent Silva's testimony regarding placing Mr. Arjon in handcuffs was based on his usual practices. Thus, the

Court does not find his memory of placing Mr. Arjon in handcuffs accurate. Given that Agent Flores asked Mr. Arjon to handle the second cellular telephone, which he did, his hands must have been uncuffed. Had he been wearing handcuffs, particularly if they were behind his back, handling the telephone would have been impossible. The Court, therefore, credits the testimony of Agent Flores and finds that Mr. Arjon was not placed in handcuffs until he was formally arrested.

Once Agent Flores had the second telephone, he requested permission to search it. Mr. Arjon consented to the search of the telephone, and Agent Flores asked him to turn on the phone. Mr. Arjon took the phone and turned it on. While the phone was powering up, Agent Flores stated to Mr. Arjon that they had pulled over his friend and that his friend was cooperating with the Border Patrol.

Once the phone was turned on, Agent Flores looked at the text messages and found a conversation between Mr. Arjon and a contact named "Yiyo." The messages were in Spanish, a language in which Agent Flores is fluent, and they were sent between 8:54 p.m. and 9:42 p.m. on November 14, 2012. At 8:54, Yiyo stated, "They are not here yet[.]" At 9:07, Yiyo sent a message that was partially unintelligible but indicated that something or someone was there. One minute later, Mr. Arjon responded, "What. I didn't understand[.]" At 9:10, Yiyo said, "The border are here[.]" Immediately, Mr. Arjon told Yiyo, "Ok wait and let me know[.]" At 9:19, Mr. Arjon told Yiyo, "6 more minutes. And almost[.]" One minute later, Yiyo said, "They are already coming ready[.]" Mr. Arjon immediately responded, "Ok come on over I'm here by the second light. Go ahead[.]" At 9:33, Yiyo told Mr. Arjon, "I'm already on my way[.]" The final message, sent at 9:42 by Mr. Arjon, asked, "Where are you[.]"

Once Agent Flores saw these messages, and particularly the message referring to "the border," Agent Flores believed that his suspicions had been confirmed. He took the messages to mean that Mr. Arjon and Yiyo were waiting for something or someone and were looking out for Border Patrol agents. Agent Flores testified that, after he saw the messages, Mr. Arjon was no longer free to leave. Agent Flores stated aloud and in English, "We have enough to take him in." From the time Agent Flores initiated the stop to the time Agent Flores discovered the text messages, fifteen to twenty minutes had elapsed.

After Agent Flores made the statement that they had enough to take him in, Mr. Arjon made a series of incriminating statements. He said that he was sorry, that it was the first time he had done something like this, and that he was only doing it because of the upcoming holidays. Agent Flores advised Mr. Arjon to be quiet and that he would be read his rights at the station.

Mr. Arjon was placed in handcuffs and seated in a marked car after making the inculpatory statements. Agent Silva drove Mr. Arjon to the station, a less than ten minute drive from the location of the stop. At the station, Mr. Arjon was placed in an eight foot by eight foot interview room. A total of three Border Patrol agents, Agents Flores, Vasquez and Solis, were in the room with him; all had weapons on their persons, but none of those weapons were brandished during the course of Mr. Arjon's interview. The agents maintained a conversational tone and conducted the interview in Spanish. At no point in time did Mr. Arjon appear to be under the influence of any intoxicants, and he seemed to fully understand what was happening. He is approximately thirty-two years old, and he told the agents that he was about to graduate or had just received his broker's license. In the interview room, Mr. Arjon was advised of his rights in English. He and Agents Flores and Solis signed the form acknowledging that he was advised

of and understood his *Miranda* rights. However, Mr. Arjon did not sign the portion of the form indicating that he waived his rights.

After Agent Flores read the *Miranda* warnings, Mr. Arjon asked Agent Flores whether a statement that he provided would affect him. Agent Flores told him that any statement could and would be used against him. According to Agent Flores, Mr. Arjon said in response that he knew he was in trouble, that he received $300 to guide the other car, that he knew Yiyo (presumably the driver of the other car) was getting marijuana, and that he did not know it was such a heavy penalty. Agent Flores responded that it is a heavy penalty. At that point, Mr. Arjon asked how much marijuana had been found in the car. When Agent Flores told him the amount recovered, Mr. Arjon stated that he did not know it would be that much. Agent Solis only recalled Mr. Arjon's statement that he knew he was in trouble. Though the Court notes this inconsistency regarding the substance of the statements made, it need not weigh in on this dispute. For purposes of this motion, it suffices that any statements made by Mr. Arjon in the interview room were made after he was Mirandized. After the brief conversation, Mr. Arjon invoked his right to an attorney. The agents immediately terminated the interview.

### LEGAL STANDARDS AND CONCLUSIONS OF LAW

Defendant moves to suppress all evidence and statements that were obtained as a result of his stop and detention on November 14, 2012. (Doc. 28). In support of the motion, he contends that (1) the initial stop was not supported by reasonable suspicion of criminal activity, (2) the scope and duration of the stop were not reasonably related to the purpose of the stop, and (3) statements were elicited from him in violation of the Fifth Amendment to the United States Constitution. (Doc. 28). The United States responds that the stop was justified at its inception,

the scope and duration of the detention were reasonable, and the statements were spontaneous and not in response to custodial interrogation. (Doc. 31; Doc. 44).

## I.    The Stop of Defendant's Vehicle was Justified at its Inception

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure . . . against unreasonable searches and seizures." U.S. Const. amend. IV. A roving border patrol stop constitutes a seizure, and the individual remains seized for the entire duration of the stop. *United States v. Gandara-Salinas*, 327 F.3d 1127, 1129 (10th Cir. 2003) (citations omitted). The United States bears the burden to demonstrate by a preponderance of the evidence that the seizure was justified. *United States v. Burciaga*, 687 F.3d 1229, 1230 (10th Cir. 2012) (citation omitted).

"Border patrol agents may . . . stop vehicles if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion." *Gandara-Salinas*, 327 F.3d at 1129 (citations and quotations omitted). Reasonable suspicion does "not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002). However, it must rise above "[i]nchoate suspicions and unparticularized hunches[.]" *United States v. Wood*, 106 F.3d 942, 946 (10th Cir. 1997) (citations omitted).

A number of factors may be considered in determining whether an agent had reasonable suspicion to stop a vehicle in the border area, including but not limited to:

> (1) [the] characteristics of the area in which the vehicle is encountered; (2) the proximity of the area to the border; (3) the usual patterns of traffic on the particular road; (4) the previous experience of the agent with alien traffic; (5) information about recent illegal border crossings in the area; (6) the driver's behavior, including any obvious attempts to evade officers; (7) aspects of the vehicle, such as a station wagon with concealed compartments; and (8) the appearance that the vehicle is heavily loaded.

*United States v. Cheromiah*, 455 F.3d 1216, 1220-21 (10th Cir. 2006) (quotation omitted).

In evaluating the factors, the Court is guided by the "totality of the circumstances" in the case. *See Arvizu*, 534 U.S. at 273 (citing *United States v. Cortez*, 449 U.S. 411, 417 (1981)). The totality of the circumstances analysis recognizes that, while each factor alone may not constitute proof of illegal conduct and may be consistent with innocent behavior, the factors taken together may amount to reasonable suspicion. *United States v. Sokolow*, 490 U.S. 1, 9 (1989) (citations omitted). Courts "may not evaluate and reject each factor in isolation," as the "Supreme Court has expressly rejected this sort of 'divide-and-conquer' analysis." *United States v. Williams*, 403 F.3d 1203, 1207 (10th Cir. 2005) (citing *Arvizu*, 534 U.S. at 274). Furthermore, the Court's totality of the circumstances analysis "is made from the perspective of the reasonable *officer*, not the reasonable *person*." *United States v. Quintana-Garcia*, 343 F.3d 1266, 1270 (10th Cir. 2003) (emphasis in original).

Here, the stop of Mr. Arjon's vehicle was clearly supported by specific, articulable facts that would generate suspicion in the mind of a reasonable officer. The factors supporting reasonable suspicion include: (1) Mr. Arjon was driving within just a few miles of the United States-Mexico border; (2) the portion of the road on which Mr. Arjon was driving is desolate with several warehouses and no residential neighborhoods for at least a few miles; (3) the area in which Mr. Arjon was driving is a known corridor for drug smuggling; (4) Mr. Arjon's driving behavior was inconsistent with the usual patterns of traffic on the road, which includes little residential traffic and moderate industrial traffic; (5) Agent Flores' knowledge that marijuana had been found in another vehicle in the area at the same time as Mr. Arjon's evasive driving; (6) Agent Flores' training and experience that drug traffickers often travel in tandem, using a lead vehicle to scout for and distract law enforcement and a load vehicle to carry the narcotics; (7)

Mr. Arjon was driving at an extremely slow rate of speed, approximately twenty to twenty-five miles per hour in a fifty-five mile per hour zone; (8) Mr. Arjon made four U-turns, driving four times over the same few-mile stretch of road; (9) in between U-turns, Mr. Arjon twice pulled to the side of the road and turned off the vehicle's lights; and (10) Agent Flores, based on training and experience, perceived Mr. Arjon's actions in pulling off the road and turning out the lights as an attempt to evade detection by law enforcement.

Mr. Arjon made much of the fact that the stop of his vehicle would not be justified had he been stopped in another part of the country. That may well be true. However, the Supreme Court has found that the border is special, setting forth a specific test that applies when a Border Patrol agent conducts an investigatory stop in the border area. It is now a well-established fact that Border Patrol agents may stop vehicles to conduct investigatory detentions in this part of the country when they are aware of specific and articulable facts supporting a belief that criminal activity is afoot. Here, the totality of the circumstances undoubtedly supported Agent Flores' belief that Mr. Arjon was involved in criminal activity.

## II.    The Stop was Reasonable in Duration and Scope

"Investigative detention of a vehicle and its occupants must be reasonably related in scope to the circumstances that justified the stop." *Cheromiah*, 455 F.3d at 1222 (citation omitted). When an officer conducts an investigative stop, he may generally "ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Berkemer v. McCarthy*, 468 U.S. 420, 439 (1984). In addition, officers are authorized to take steps "reasonably necessary to protect their personal safety and to maintain the status quo" during the course of the investigative detention. *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993). However, the scope and duration of

the detention must be reasonably limited to that which is necessary "to effectuate the purpose of the stop." *United States v. Millan-Diaz*, 975 F.2d 720, 721 (10th Cir. 1992) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). The driver and other occupants may be further detained only "if, during the course of a roving patrol stop, the Border Patrol agent develops an objectively reasonable and articulable suspicion that the occupants are engaged in some other illegal activity, or if the encounter becomes consensual." *Cheromiah*, 455 F.3d at 1222 (citing *United States v. Rosborough*, 366 F.3d 1145, 1148 (10th Cir. 2004)).

A detention ceases to be an investigatory stop "and becomes an arrest if it continues for an excessive time or closely resembles a traditional arrest." *Morris v. Noe*, 672 F.3d 1185, 1192 (citing *Hiibel v. Sixth Judicial Dist. Ct. of Nev.*, 542 U.S. 177, 186 (2004)). "An arrest is 'characterized by highly intrusive or lengthy search or detention,' and must therefore be supported by probable cause." *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004) (quoting *Oliver v. Woods*, 209 F.3d 1179, 1185 (10th Cir. 2000)). Officers have probable cause to arrest only when the facts and circumstances within their knowledge, "of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Id.* (quoting *United States v. Edwards*, 242 F.3d 928, 934 (10th Cir. 2001)).

Here, the initial stop was predicated on Agent Flores' reasonable belief that the driver of the black Silverado was involved in drug trafficking and was affiliated with the gold Camry that had been stopped nearby. Consequently, Agent Flores acted reasonably in questioning Mr. Arjon about his identity and his erratic driving. When Mr. Arjon explained his driving behavior by stating that he was having an argument with his girlfriend, Agent Flores sensibly inferred that, because there was no one else in the car, Mr. Arjon must have been arguing over telephone.

Accordingly, Agent Flores sought to quickly confirm Mr. Arjon's story by requesting permission to search his cellphone. Agent Flores found nothing on the phone to support Mr. Arjon's story, so his suspicion remained. At that point, Agent Flores asked Mr. Arjon whether he had a second telephone, which could have verified his story. Mr. Arjon stated that he did not. Agent Flores' suspicion remained, so he requested and received permission to search the Silverado.

While that search was ongoing, Agent Silva perceived a possible safety threat and decided to conduct a pat-down search. Officers have "wide discretion to take reasonable precautions to protect [their] safety." *United States v. Rice*, 483 F.3d 1079, 1084 (10th Cir. 2007) (citation omitted). Concerns about officer safety are "both legitimate and weighty . . . ." *United States v. Dennison*, 410 F.3d 1203, 1211 (10th Cir. 2005) (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977)). However, an officer may only conduct a pat-down search of a driver if the officer possesses reasonable suspicion to believe that the driver may be "armed and dangerous." *Id.* (quoting *Knowles v. Iowa*, 525 U.S. 113, 118 (1998)).

The Court concludes that Agent Silva had reasonable suspicion to believe Mr. Arjon might be armed and dangerous. The specific criminal activity in which the agents suspected Mr. Arjon was involved was drug trafficking. Agent Silva was aware from his training and experience that weapons are a concern whenever drug trafficking is suspected. In addition, Mr. Arjon was fidgety, failed to obey commands and continued to turn around to look at the agents. Agent Silva believed this behavior was consistent with looking for an escape route or a means to harm the agents. Based on these facts, Agent Silva suspected that Mr. Arjon was armed and dangerous and deemed it necessary to conduct a pat-down search for weapons to ensure his and the other officers' safety. The Court finds that the pat-down search for weapons was supported

by reasonable suspicion that Mr. Arjon was armed and dangerous given the totality of the circumstances.

In the course of the pat-down search, Agent Silva felt a hard object in Mr. Arjon's breast pocket. He could not identify the object and believed it could have been a weapon. Though Agent Silva could not identify the nature of the object, "a reasonable officer isn't credited with x-ray vision and can't be faulted for having failed to divine the true identity of the objects." *United States v. Rochin*, 662 F.3d 1272, 1274 (10th Cir. 2011). "During a lawful pat down an officer may remove not just objects that seem to be guns, knives and the like, but also any other objects that he reasonably thinks 'might be used as instruments of assault' against him or others who may be in the area." *Id.* (quoting *Sibron v. New York*, 392 U.S. 40, 65 (1968)). Agent Silva was certainly justified in removing an unidentifiable hard object from Mr. Arjon's pocket.

Once Agent Silva removed the object and found that it was a second cellphone, which Mr. Arjon previously denied possessing, the reasonable suspicion to believe that Mr. Arjon was involved in criminal activity increased. Agent Flores requested and received permission to search the phone. The discovery of the phone and request to search it were reasonably attendant to the purposes of the investigatory detention. Once the cellphone was searched and the text messages were obtained, particularly in light of Mr. Arjon's statements that immediately followed, there is no dispute that agents had probable cause to arrest Mr. Arjon.

### III.    There was no Custodial Interrogation

Pursuant to the Fifth Amendment, all persons have a privilege against self-incrimination. U.S. CONST. amend. V. To give practical effect to this constitutional guarantee, the Supreme Court requires law enforcement to advise persons in custody as to the privilege prior to interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 479 (1966). The advisement of rights is

constitutionally required only when a person is in custody and subject to interrogation. *Perdue*, 8

F.3d at 1463. Because the Court finds that none of Mr. Arjon's statements was made in response

to interrogation, the Court need not address whether Mr. Arjon was in custody.

 Statements are only subject to exclusion if they are obtained as a result of police

"interrogation." Interrogation results when there are "words or actions on the part of the police

(other than those normally attendant to arrest and custody) that the police should know are

reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*,

446 U.S. 291, 301 (1980). Thus, interrogation includes both express and implied questioning.

However, statements that are not made in response to either express or implied questioning are

not subject to exclusion. *United States v. Pettigrew*, 468 F.3d 626, 633 (10th Cir. 2006).

Additionally, *Miranda* does not bar statements made in response to procedural-type police words

or actions "normally attendant to arrest and custody." *Innis*, 446 U.S. at 301. Such non-

accusatory interactions between officers and suspects do not meet the definition of

"interrogation," which encompasses only those "words or actions . . . reasonably likely to elicit

an incriminating response from the suspect." *Id.*

 Similarly, volunteered statements made to police officers are not excluded under

*Miranda*:

> The fundamental import of the privilege while an individual is in custody is not
> whether he is allowed to talk to the police without the benefit of warnings and
> counsel, but whether he can be interrogated. There is no requirement that police
> stop a person who enters a police station and states that he wishes to confess to a
> crime, or a person who calls the police to offer a confession or any other
> statement he desires to make. Volunteered statements of any kind are not barred
> by the Fifth Amendment . . . .

*Miranda*, 384 U.S. at 478; *see also United States v. Muniz*, 1 F.3d 1018, 1022 (10th Cir. 1993)

(citations omitted) ("If a person voluntarily speaks without interrogation by an officer, the Fifth

Amendment's protection is not at issue, and the statements are admissible."). In determining whether a suspect's statements were voluntary and not coerced, the Court must look to the totality of the circumstances, considering the characteristics of the accused, including his age, level of education, and intelligence, and the details of the detention, including the advisement of rights and length of detention and questioning. *Muniz*, 1 F.3d at 1022 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 22 (1973)). "The test is whether the person's will was overcome, or whether the statement was freely made." *Id.* (citation omitted).

Here, the first incriminating statements were made by Mr. Arjon immediately prior to his formal arrest and following Agent Flores' statement that the agents had "enough to take him in." Telling other officers that they have enough information to take a suspect into custody is a procedural statement normally attendant to arrest. It would not be reasonable for Agent Flores to anticipate that his statement would elicit an incriminating response. Moreover, the statements were voluntary. Mr. Arjon is a man in his thirties and is sufficiently intelligent and educated as evidenced by the fact that he was pursuing a brokerage license. The circumstances were not unduly coercive. Though there were at least four Border Patrol agents at the scene, none had his weapon drawn, only one was in uniform, and Mr. Arjon was not yet in handcuffs. As such, Mr. Arjon's spontaneous statements, made after he heard that he was going to be taken into custody, were not obtained as a result of interrogation, were voluntarily made, and are not subject to exclusion.

The next incriminating statements made by Mr. Arjon followed the advisement of rights and Agent Flores' confirmation that any statements made by Mr. Arjon could and would be used against him. Agent Flores asked no questions to elicit those statements and simply advised Mr. Arjon of his rights. Advising a suspect of his rights is, again, a procedural matter that normally

follows an arrest, and it was not an interaction one would consider likely to elicit an incriminating response. As stated above, no circumstances about Mr. Arjon indicate that the statement was not voluntary. The details of the detention, however, had changed. At the station, there is no question that Mr. Arjon was in custody. However, the agents were using normal tones of voice, the interview room was not too cramped, and the agents did not have their weapons drawn, nor were they in uniform. Thus, the Court finds that Mr. Arjon's statements were made spontaneously and voluntarily.

The final incriminating statements made by Mr. Arjon followed his question about how much marijuana was found and Agent Flores' response as to the amount. Information about the crime with which the arrestee is charged is also a procedural statement that is expected after an arrest. It is not reasonable to expect a person to make an incriminating statement after he is told of the details of the charge against him. For the reasons above, there is no reason to believe that the statements made in the interview room were coerced or that Mr. Arjon was not speaking voluntarily. The Court concludes that Mr. Arjon's statement that he did not know it would be so much marijuana was spontaneous and voluntary.

There is an additional basis on which the Court finds Mr. Arjon's statements at the station admissible. After Mr. Arjon was arrested and transported to the station, Agent Flores advised Mr. Arjon of his rights. There was no dispute as to the adequacy of the warning.[1] Mr. Arjon acknowledged that he understood his rights by signing the *Miranda* waiver form. He did not, however, sign the "waiver" portion of the form. Nevertheless, the Government established that

---

[1] Given the testimony that the warning was provided in English while the remainder of the interview was conducted in Spanish, the Court deems it appropriate to take judicial notice that Defendant is fluent in English. The suppression hearing was conducted in English, and Defendant did not request or require the assistance of a Spanish language interpreter.

Mr. Arjon did not affirmatively invoke his *Miranda* rights until after making the statements at issue. Instead, Mr. Arjon waived his rights by continuing to engage with law enforcement.

Once the Fifth Amendment right attaches, a suspect may waive his Fifth Amendment privilege and speak with law enforcement at any point, provided that the totality of the circumstances demonstrates that the waiver is voluntary, knowing and intelligent. *United States v. Burson*, 531 F.3d 1254, 1256 (10th Cir. 2008) (citations omitted). The Supreme Court recently held that "after giving a *Miranda* warning, police may interrogate a suspect who has neither invoked nor waived his or her *Miranda* rights." *Berghuis v. Thompkins*, --- U.S. ----, ----, 130 S. Ct. 2250, 2264 (2010). This is because "a suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police." *Id.* For the reasons explained above, in combination with Mr. Arjon's acknowledgement that he received and understood the *Miranda* warnings, Mr. Arjon's statements were not coerced. By continuing to speak to the agents after he had been advised of his rights, Mr. Arjon effectively waived his rights, and the statements are admissible.

A suspect may invoke his right to remain silent and right to counsel at any point in the interrogation. A suspect's invocation of his *Miranda* rights is effective only if the invocation is clear and unambiguous. *United States v. Davis*, 512 U.S 452, 459 (1994); *United States v. Rambo*, 365 F.3d 906, 910 (10th Cir. 2004) (citation omitted). Once an accused has invoked his right to have counsel present during custodial interrogation, he may not be subjected to further interrogation by the authorities until counsel has been made available. *Edwards v. Arizona*, 451 U.S 477, 484-85 (1981). Here, after Mr. Arjon made the incriminating statements at issue, he clearly and unequivocally invoked his right to counsel. At that point, the Border Patrol agents

terminated the interview, and no further questioning ensued. The agents responded properly to the Mr. Arjon's invocation of his *Miranda* rights, and no Fifth Amendment violation occurred.

**THEREFORE,**

      **IT IS ORDERED** that Defendant Jesse Alonzo Arjon's Motion to Suppress (Doc. 28) is **DENIED**.

      **DATED** _____, 2013.


                                  _____

                                  **MICHAEL J. REAGAN**
                                  **UNITED STATES DISTRICT JUDGE**